THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. ROBERT L. MORGAN, JR., Defendant-Appellee.

Fourth District   No. 4—07—0653

Opinion filed February 9, 2009.

Thomas J. Brown, State's Attorney, of Pontiac (Norbert J. Goetten, Robert J. Biderman, and Charles F. Mansfield, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

James T. Reilly, of Reilly Law Office, LLC, of Streator, for appellee.

JUSTICE MYERSCOUGH delivered the opinion of the court:

In March 2007, the State charged defendant, Robert L. Morgan, Jr., with offenses arising out of an incident occurring on March 1,

2007. In July 2007, the trial court granted defendant's motion to suppress, finding the police officers entered defendant's home on the basis of an "invalid warrant" and without consent.

On appeal, the State argues that the trial court erred by suppressing the evidence because (1) the good-faith exception bars application of the exclusionary rule because the officers acted reasonably and were unaware that defendant had cleared his arrest warrant earlier in the day; (2) defendant's father, Robert Leo Morgan, Sr. (Senior), consented to the officers' entry into the residence; and (3) exigent circumstances justified the officers' entry into the residence. The State also requests that the cause be remanded for a hearing on whether defendant's inculpatory statements, made without being advised pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), must be suppressed. Although the trial court erred by finding that an invalid warrant, as a matter of law, rendered all the evidence subject to suppression, we affirm because applying the exclusionary rule here would deter the officers' grossly negligent, reckless, or wilful conduct, so the benefits of excluding the evidence would outweigh the costs. Moreover, neither consent nor exigent circumstances justified the warrantless entry into the home.

## I. BACKGROUND

On March 12, 2007, the State charged defendant with (1) unlawful possession of a controlled substance (a substance containing cocaine) (720 ILCS 570/402(c) (West 2006)); (2) unlawful possession of drug paraphernalia, a metal smoking pipe, with the intent to use the pipe to inhale cannabis into his body (720 ILCS 600/3.5(a) (West 2006)); and (3) unlawful possession of drug paraphernalia, a multicolored chillum, with the intent to use that pipe to inhale cannabis into his body (720 ILCS 600/3.5(a) (West 2006)). All charges stemmed from an incident occurring on March 1, 2007.

In July 2007, defendant filed a motion to suppress evidence and statements. The motion alleged that the arrest warrant was invalid and the officers had no other valid, lawful reason to be in defendant's residence.

On July 11, 2007, the hearing on the motion to suppress commenced. Senior testified that he owned the home at 1424 Cleveland Avenue in Streator, Illinois. Senior's two sons, defendant and Johnathan, also lived there. Defendant's girlfriend, Ashley Balliez, stayed at the home frequently.

On the evening of March 1, 2007, at approximately 8:30 or 9 p.m., Senior answered a knock on the "back door by the kitchen." The officer at the door stated he had a warrant for defendant's arrest. Senior

explained he had bailed defendant out of jail that morning and had the paperwork to show this. The paperwork purportedly showing that Senior had bailed defendant out of jail is not contained in the record on appeal. Senior told defendant, who was in the kitchen, to get the paperwork. Defendant headed upstairs.

The officer asked Senior if he could enter the house. Senior asked the officer if he had a warrant, and when the officer said he did not, Senior told him to get a warrant if he wanted to enter the house. Senior told the officer he would get defendant. As Senior shut the door, the officer shoved the door open, knocking Senior into the kitchen. Three officers came running in and chased defendant upstairs.

Balliez got the paperwork showing the warrant had been taken care of, and Senior saw her give it to either defendant or Johnathan. The officers uncuffed defendant and sent him downstairs to the kitchen. One of the officers remained upstairs. Senior heard one of the officers call about the warrant and learned defendant did not have an outstanding warrant.

Senior testified that while defendant was in the kitchen, an officer came down from upstairs with a Baggie containing purported cocaine. Defendant denied that it was his. The officers told defendant that either he had to say it belonged to him or they would take Johnathan to jail because the Baggie was found in Johnathan's room. Defendant admitted it belonged to him. The officers handcuffed defendant again. The officers asked Senior for permission to search the home. Senior said, "No." The officers escorted defendant out of the house, saying they were taking him to jail. About five minutes later, defendant returned unhandcuffed. Senior never heard the officers give defendant any *Miranda* warnings.

Johnathan Morgan, defendant's 17-year-old brother, testified that defendant walked into his room with three police officers following him. The officers slammed defendant down on the floor and handcuffed him. Balliez brought Johnathan the paperwork, and Johnathan handed the papers to one of the police officers. Johnathan recalled one of the officers radioing in something.

Johnathan testified that two of the officers and defendant went downstairs. Johnathan saw the third officer searching Johnathan's bedroom with a flashlight, looking under things and picking things up, but not going through any drawers. The officer then sent Johnathan downstairs. The officer did not find anything prior to Johnathan leaving the room. Johnathan denied smoking marijuana in the room that night.

Leland Brooke testified he was a sheriff's deputy in the proactive unit of the Livingston County sheriff's department. (Proactive unit is

never defined in the record.) On March 1, 2007, Deputy Brooke and Officer Krippel obtained a list of outstanding La Salle County warrants from the Streator police department. Deputy Brooke explained that every list he had gotten from the police department was printed off that same day, usually in his presence. This one was not printed out that day in his presence. The list contained defendant's name, date of birth, and address. The list is not contained in the record on appeal.

Deputy Brooke and Officer Krippel met Deputy Joshua White at a grocery store and proceeded to defendant's residence. Less than five minutes passed between obtaining the warrant list and arriving at defendant's residence. Deputy Brooke admitted he did not call La Salle County to confirm the validity of the warrant prior to going to defendant's residence.

Deputy Brooke went to the rear of the residence to ensure that no one left out a window. After a few minutes, Deputy Brooke went around the south side of the house and saw a door standing wide open. Officer Brooke could hear struggling inside the residence and heard Officer Krippel say "stop resisting." Deputy Brooke announced "Sheriff's Department" and entered the house. He ran up the stairs and saw defendant handcuffed, standing by a speaker.

Deputy Brooke then called LivCom, the communication center, to verify the validity of the warrant and to advise LivCom that the warrant had been executed. However, Deputy Brooke was told that the warrant was "not valid." Thereafter, someone handed Officer Krippel the paperwork concerning the bail bond.

Deputy Brooke testified he did not see any packaged contraband in Johnathan's room but that "[O]fficer Krippel had picked up a piece of rock cocaine" off the floor. Officer Brooke testified defendant and the other officers went downstairs while he stayed upstairs with Johnathan. Officer Brooke denied searching the room but admitted looking around. Officer Brooke agreed his police report noted he had smelled a strong odor of burnt cannabis in the room. However, he did not see any roach clips, bongs, or cannabis residue. He and Johnathan proceeded downstairs together.

Once downstairs, Deputy Brooke saw defendant sitting at the kitchen table. Deputy Brooke was not present during any questioning of defendant regarding the "rock cocaine." Deputy Brooke testified that Senior consented to a search of the house. Deputy Brooke then asked defendant if there was anything in the house the officers needed to know about. Defendant led the officers upstairs and showed them "another rock" and "a crack pipe" behind the speaker. Defendant admitted they belonged to him. Defendant also led them to a

downstairs bedroom where he had a chillum, a pipe used to ingest cannabis, in a bedroom drawer. Deputy Brooke admitted he did not give defendant any *Miranda* warnings nor did he hear anyone else give defendant *Miranda* warnings.

Balliez testified that she was in the kitchen when Senior spoke to the officers at the door. Balliez heard Senior tell the officers that he would get the paperwork (pertaining to the bail bond) and to wait there. Balliez saw Senior fall down, and three officers ran upstairs. Balliez got the paperwork and gave it to Johnathan on the stairwell. Balliez did not go upstairs to Johnathan's bedroom.

Balliez testified defendant eventually came downstairs to the kitchen, not in the presence of the officers. One of the officers came down and showed defendant a plastic bag containing purported drugs. Another officer came downstairs with Senior. The officers handcuffed defendant and told him he was going to jail if he did not say to whom the drugs belonged. The officers also said Johnathan was going to jail because the drugs were found in Johnathan's room. Defendant admitted the drugs were his. Balliez did not hear the officers read defendant his *Miranda* rights.

Balliez admitted she had contacted the police a few weeks prior to the hearing about defendant pushing her down and Senior pursuing her when she fled. She denied that incident had influenced her testimony. Balliez testified she and defendant were "[n]ot quite a couple" but were still talking.

Jacob Krippel testified he was a police officer with the Fairbury police department. Officer Krippel could not recall the date on the warrant list. The date was a few days old, within three days. The list consisted of 10 pages of names with approximately 20 names on a page. He looked to see if any of the people on the list lived in Livingston County.

Officer Krippel first testified that he could not recall whether he or Deputy White knocked on the door. Officer Krippel then testified that when Deputy White knocked on the door, he was standing at the front of the residence about 15 to 20 feet from an open window. Officer Krippel saw defendant. Officer Krippel had seen defendant before that day but had never had any one-on-one dealings with him. Their eyes met through the window as Officer Krippel announced "Sheriff's Police." Officer Krippel saw defendant turn around and run up the stairs. Officer Krippel did not see any weapons on defendant.

Officer Krippel went around to the side door and stood next to Officer White. Senior opened the door and did not invite them in. The officers told Senior they had a warrant for defendant's arrest and needed to talk to him. Senior turned around and walked into the residence

leaving the door open. Officer Krippel entered the residence and pursued defendant up the stairway. Officer Krippel denied that anyone knocked Senior over. He was not sure whether Senior was telling them to get out. After they had entered, however, Officer Krippel did hear Senior say, "I didn't tell you you could come in." On cross-examination, Officer Krippel testified he entered the home for "officer safety" after seeing defendant run upstairs.

When Officer Krippel got upstairs, he noticed the odor of cannabis. Officer Krippel arrested defendant but did not read him the *Miranda* warnings. Officer Krippel described the scene as "chaotic."

After defendant was cuffed, Deputy Brooke placed a call to check the validity of the arrest warrant and learned defendant was clear of any warrants. Officer Krippel testified he had no way of knowing at that point whether the warrant was executed, recalled, or whether defendant had turned himself in. All Officer Krippel knew at that point was that the warrant had been removed from the system. He had no knowledge how long it takes to remove a warrant from the system.

Senior then gave Officer Krippel the paperwork showing Senior had bailed defendant out of jail that morning. Officer Kripple unhandcuffed and "unarrested" defendant.

After uncuffing defendant, Officer Krippel noticed the bag with the "crack rock." Officer Krippel escorted defendant downstairs to the kitchen. After field-testing the substance in the plastic bag, Officer Krippel handcuffed defendant again.

In the kitchen, Officer Krippel asked defendant to whom the purported cocaine belonged. On cross-examination, however, Officer Krippel testified he could not recall if he asked defendant to whom it belonged, but that defendant told Deputy Brooke it belonged to defendant. Officer Kripple denied telling defendant that someone was going to jail or that because the cocaine was found in Johnathan's room, Johnathan would go to jail.

Officer Krippel asked Senior for consent to search the residence. At first, Senior said "no" and accused Krippel of planting the evidence. Officer Krippel told Senior that if he had planted the evidence, he would not find anything in a search, consent would clear it up, and the officers would leave. Senior consented to the search. Officer Krippel was going to go outside and get a consent-to-search form. However, Officer Krippel spoke to the State's Attorney on the phone and was told to collect the evidence, release defendant, and send the report to review for charges.

Following the testimony, the trial court asked for the State's theory why the evidence should not be suppressed. The prosecutor argued

consent and flight. Citing *People v. Sullivan*, 243 Ill. App. 3d 830, 612 N.E.2d 1000 (1993), the court concluded the evidence must be suppressed:

> "Well, I find that the officers, given the state of their knowledge about the warrant, acted very reasonably. They thought the warrant was outstanding for the defendant. They were going to execute the warrant. Officer Krippel was reasonable in feeling concern for officer safety in pursuing the defendant upstairs. The fact remains that the entry into this residence was by the authority of the so[-] called warrant. The warrant was invalid. The entry was not by consent I find under this evidence. There was no consent by Senior."

On the issue of the statements made by defendant, the State argued no one had suggested defendant was interrogated and that a question existed whether it was even custodial. However, the trial court found the confession was the fruit of an illegal search and "should be suppressed for that reason alone." The court also found the State would be "hard pressed" to show that defendant would have felt free to go or that enough time had passed that would have rendered defendant "not in custody" when he made the incriminating statements. However, the court concluded that issue need not be reached because the statements were the fruit of an illegal search and should be suppressed for that reason.

The State then argued the warrant was not invalid and that "a number of things *** take it out of the officer's hands when people bolt." The trial court asked whether the State was trying to raise a good-faith exception to the exclusionary rule. The following exchange occurred:

> "MR. LUCKMAN [(Assistant State's Attorney)]: I think it goes too far to say that every time police act on an arrest warrant that turns out to either be recalled, or mistaken, or it has already been served and the fellow bonded, but the records haven't been updated [the evidence must be suppressed]. *** So my point is this, simply that merely because this *** arrest warrant[ ] had been otherwise disposed of, does not in and of itself render unlawful or render constitutionally impermissible that which the officers did. I think that is a very important distinction because we are not talking about something that is long after the fact, and that has had time to fester in the system and bespeaks negligence or impropriety on the part of the police.
>
> THE COURT: No, I am not suggesting negligence or impropriety. In fact, I prefaced this with that the officers acted reasonably with the knowledge that they had. And what you just urged there is what you wished the law to be. I find the law is not that in Illinois

at this time. And if the State wants to take that up, it should, and then argue to the Appellate Court, well, under these circumstances, this warrant wasn't so stale that all of this should be suppressed and we want the Appellate Court to make new law.

I am finding it as a matter of law under this set of circumstances an invalid warrant renders all this suppressible and should be and it is suppressed. *** [I]t would be improper for the State to rely on a stale warrant to establish probable cause to arrest defendant. This was a stale warrant. And when you act on a stale warrant, you don't get any benefits from it I find as a matter of law."

The State filed its certificate of impairment, and this appeal followed.

## II. ANALYSIS

On appeal, the State argues that the trial court erred by suppressing the evidence for the following reasons: (1) the good-faith exception bars application of the exclusionary rule because the officers acted reasonably and were unaware that defendant had cleared his arrest warrant earlier in the day, (2) Senior consented to the officers' entry into the residence, and (3) exigent circumstances justified the officers' entry into the residence. The State also requests that the cause be remanded for a hearing on whether defendant's inculpatory statements, made without being advised of his *Miranda* rights, must be suppressed.

### A. Standard of Review

The State argues our review is *de novo*. The State asserts that the trial court's order was based on a legal determination and, by finding that the officers acted reasonably, the court accepted the officers' testimony as credible.

The review of a trial court's ruling on a motion to suppress involves mixed questions of fact and law. *People v. Gherna*, 203 Ill. 2d 165, 175, 784 N.E.2d 799, 805 (2003). This court gives great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *Gherna*, 203 Ill. 2d at 175, 784 N.E.2d at 805. However, this court reviews *de novo* the trial court's legal determination of whether suppression is warranted under those facts. *Gherna*, 203 Ill. 2d at 175, 784 N.E.2d at 805.

### B. The Fourth Amendment of the United States Constitution and Article I, Section 6, of the Illinois Constitution Are Interpreted as Having the Same Meaning and Effect

The fourth amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. Likewise, under our state constitution, "[t]he people shall have the right to be secure in their persons, houses, papers[,] and other possessions against unreasonable searches[ ] [and] seizures." Ill. Const. 1970, art. I, §6. As recently stated by this court in *People v. Leggions*, 382 Ill. App. 3d 1129, 1132, 890 N.E.2d 700, 704 (2008):

> "We interpret article I, section 6, in 'limited lockstep' with the fourth amendment. *People v. Caballes*, 221 Ill. 2d 282, 313, 851 N.E.2d 26, 44 (2006) (reaffirming the 'limited lockstep' doctrine). 'Under this approach, [Illinois courts] will "look first to the federal constitution, and only if federal law provides no relief [will they] turn to the state constitution to determine whether a specific criterion—for example, unique state history or state experience— justifies departure from federal precedent." ' *Caballes*, 221 Ill. 2d at 309, 851 N.E.2d at 42-43, quoting L. Friedman, *The Constitutional Value of Dialogue and the New Judicial Federalism*, 28 Hastings Const. L.Q. 93, 104 (2000)."

In this case, neither party argues for a departure from federal precedent on the ground that article I, section 6, of the Illinois Constitution requires a different outcome than the fourth amendment. Therefore, this court will interpret the quoted provisions from the two constitutions as having the same meaning and effect.

## C. The Trial Court Did Not Err by Suppressing the Evidence Because the Officers Did Not Act in Good Faith

In its brief, the State concedes that the "arrest of [defendant] on [the inactive warrant] violated the fourth amendment." The State argues, however, that the good-faith exception to the exclusionary rule should apply.

When police officers rely on incorrect information contained in the criminal justice system records to arrest a defendant, any evidence obtained as a result of an inactive warrant is subject to suppression. See *People v. Anderson*, 304 Ill. App. 3d 454, 459, 711 N.E.2d 24, 27 (1999) (finding that where the police officers based their stop of the defendant on information contained in old reports, knew they had not seen the defendant's name on more current reports, and were unable to confirm whether a warrant was outstanding against defendant because the computers were down, evidence obtained during a search of the defendant must be suppressed); *Sullivan*, 243 Ill. App. 3d at 833, 612 N.E.2d at 1003 (finding that "[w]here police fail to update their warrant records to remove an individual's name from an active warrant list, any evidence obtained from a search incident to the arrest on that inactive warrant must be suppressed").

However, a fourth-amendment violation does not always require

that evidence be suppressed. *United States v. Leon*, 468 U.S. 897, 906-07, 82 L. Ed. 2d 677, 688, 104 S. Ct. 3405, 3412 (1984) (holding that the exclusionary rule would not be applied where the evidence was obtained by officers acting in reasonable reliance on a search warrant issued by a detached, neutral magistrate even though the search warrant was subsequently found to be unsupported by probable cause). "The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations of [f]ourth[-a]mendment rights through the rule's general deterrent effect." *Arizona v. Evans*, 514 U.S. 1, 10-11, 131 L. Ed. 2d 34, 44, 115 S. Ct. 1185, 1191 (1995).

### 1. *Creation of the Good-Faith Exception to the Exclusionary Rule*

In *Leon*, the United States Supreme Court examined whether evidence obtained by officers acting in reasonable reliance on a search warrant issued by a neutral magistrate but later found to be unsupported by probable cause had to be suppressed. *Leon*, 468 U.S. at 900, 82 L. Ed. 2d at 684, 104 S. Ct. at 3409. The Court made the following analysis:

"First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the [f]ourth [a]mendment or that lawlessness among these actors requires application of the extreme sanction of exclusion.

Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." *Leon*, 468 U.S. at 916, 82 L. Ed. 2d at 694, 104 S. Ct. at 3417.

The *Leon* Court concluded that the officers acted reasonably and had no grounds to believe the warrant was not properly issued. *Leon*, 468 U.S. at 926, 82 L. Ed. 2d at 701, 104 S. Ct. at 3422. Moreover, the Court found that the benefits of suppressing the evidence did not outweigh the costs. *Leon*, 468 U.S. at 922, 82 L. Ed. 2d at 698, 104 S. Ct. at 3420. Courts have subsequently interpreted *Leon* as requiring three conditions precedent to applying the exclusionary rule: (1) misconduct by the police or "adjuncts to the law[-]enforcement team," (2) applying the exclusionary rule will result in appreciable deterrence of police misconduct, and (3) the benefits of excluding the evidence must outweigh the costs of excluding the evidence. *United States v. Herring*, 492 F.3d 1212, 1217-18 (11th Cir. 2007) (*Herring I*) (finding no deterrent effect would be had by suppressing evidence where a police officer in one county was told by a warrant clerk in another

county that the defendant had an outstanding warrant when, in fact, the warrant had been recalled), *aff'd*, 555 U.S. 135, 172 L. Ed. 2d 496, 129 S. Ct. 695 (2009) (*Herring II*).

The Illinois legislature codified the good-faith exception articulated in *Leon* in sections 114—12(b)(1) and (b)(2) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114—12(b)(1), (b)(2) (West 2006)). See *Anderson*, 304 Ill. App. 3d at 464, 711 N.E.2d at 31. Section 114—12(b)(1) provides that a court should not suppress otherwise admissible evidence if a police officer seized the evidence in good faith. Section 114—12(b)(2) sets forth the definition of "good faith" to include whenever a peace officer obtains evidence:

> "(i) pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid; or
>
> (ii) pursuant to a warrantless search incident to an arrest for violation of a statute or local ordinance which is later declared unconstitutional or otherwise invalidated." 725 ILCS 114—12(b)(2)(i), (b)(2)(ii) (West 2006).

Approximately 10 years after *Leon*, the United States Supreme Court, in *Evans*, 514 U.S. at 3-4, 131 L. Ed. 2d at 39, 115 S. Ct. at 1187-88, considered whether suppression was warranted where a police officer acted in reliance on a police record indicating the existence of an outstanding arrest warrant, where it was later determined the police record was erroneous because the warrant had been quashed. In *Evans*, the police officer effectuated a traffic stop of the defendant. *Evans*, 514 U.S. at 4, 131 L. Ed. 2d at 39, 115 S. Ct. at 1188. The officer entered the defendant's name into a computer-data system that indicated that the defendant had an outstanding warrant for his arrest. *Evans*, 514 U.S. at 4, 131 L. Ed. 2d at 40, 115 S. Ct. at 1188. However, the warrant had been quashed 17 days before the defendant's arrest. *Evans*, 514 U.S. at 4, 131 L. Ed. 2d at 40, 115 S. Ct. at 1188. It appeared, although not clear, that a court clerk had failed to notify the sheriff's office that the warrant had been quashed, as required by standard procedures. *Evans*, 514 U.S. at 5, 131 L. Ed. 2d at 40-41, 115 S. Ct. at 1188.

Applying the reasoning in *Leon*, the Court concluded that if the court employee was responsible for the error, application of the exclusionary rule would not have a deterrent effect. *Evans*, 514 U.S. at 14-15, 131 L. Ed. 2d at 46-47, 115 S. Ct. at 1193. Specifically, the Court found (1) the exclusionary rule was designed to deter police misconduct, not mistakes by court employees, (2) the defendant

provided no evidence that "court employees are inclined to ignore or subvert the [f]ourth [a]mendment or that lawlessness among" court employees requires the application of the exclusionary rule, and (3) application of the exclusionary rule in this instance would not have a significant deterrent effect on court employees because they are not part of the law-enforcement team and have no stake in the outcome of a particular case. *Evans*, 514 U.S. at 14-15, 131 L. Ed. 2d at 46-47, 115 S. Ct. at 1193. The Court further concluded that if the court clerk was the person responsible for the error, application of the exclusionary rule would not deter the arresting officer. *Evans*, 514 U.S. at 15, 131 L. Ed. 2d at 47, 115 S. Ct. at 1193. The Court found no indication the "arresting officer was not acting objectively reasonably when he relied on the police computer record." *Evans*, 514 U.S. at 15-16, 131 L. Ed. 2d at 47, 115 S. Ct. at 1194. Therefore, the Court concluded that exclusion of the evidence was not required. *Evans*, 514 U.S. at 16, 131 L. Ed. 2d at 48, 115 S. Ct. at 1194.

## 2. Although the Trial Court Erred as Matter of Law by Failing To Consider the Good-Faith Exception to the Exclusionary Rule, the Exception Does Not Apply Here

In the instant case, the trial court did not address the good-faith exception to the exclusionary rule. The court asked the State whether the State was raising a good-faith exception. The prosecutor responded by arguing that the officers' actions were not rendered unlawful simply because the warrant was no longer valid, given that the warrant had only recently been rendered inactive. The court ultimately concluded, as a matter of law, that under the circumstances, the invalid warrant required the evidence be suppressed.

Several cases do support the trial court's decision: *Anderson*, 304 Ill. App. 3d at 459, 711 N.E.2d at 27, and *People v. Joseph*, 128 Ill. App. 3d 668, 470 N.E.2d 1303 (1984). Without even considering the three factors articulated in *Leon*, the *Anderson* court rejected the State's argument that the officers acted in good faith, concluding that the exception "does not apply to a police encounter that is occasioned entirely by the officers' mistaken belief that there was a warrant for defendant's arrest." *Anderson*, 304 Ill. App. 3d at 464-65, 711 N.E.2d at 31 (wherein officers based their stop on information contained in old reports when they knew they had not seen the defendant's name on more current reports).

Similarly, in *Joseph*, the court also refused to apply the good-faith exception, noting: "[I]t is our opinion that the good-faith reliance of the arresting officer, in acting upon information provided to him through police channels, cannot overcome the intrusion made upon

defendant's fourth[-]amendment rights." *Joseph*, 128 Ill. App. 3d at 672, 470 N.E.2d at 1306; see also 2 W. LaFave, Search & Seizure §3.5(d), at 293, 297 (4th ed. 2004) ("the police may not rely upon incorrect or incomplete information when they *** are at fault in permitting the records to remain uncorrected" and noting the *Evans* "rationale would seem inapplicable whenever the mistake was instead attributable to the law[-]enforcement agency").

However, the United States Supreme Court has consistently held that whether the fourth amendment has been violated and whether exclusion is the appropriate sanction for the violation are separate issues. See *Herring II*, 555 U.S. at 137, 172 L. Ed. 2d at 502, 129 S. Ct. at 698; *Leon*, 468 U.S. at 906, 82 L. Ed. 2d at 688, 104 S. Ct. at 3412; *Evans*, 514 U.S. at 10, 131 L. Ed. 2d at 44, 115 S. Ct. at 1191; see also *People v. Sutherland*, 223 Ill. 2d 187, 227, 860 N.E.2d 178, 208 (2006). Moreover, while *Anderson* was decided after *Evans*, *Joseph* and the cases relied on in *Anderson* predated *Evans*, which applied the good-faith exception to police acting in reliance on police records showing the existence of an outstanding warrant when the warrant had been quashed. *Evans*, 514 U.S. at 15, 131 L. Ed. 2d at 47, 115 S. Ct. at 1193 (wherein the error was attributed to a neutral court employee as opposed to a member of the law-enforcement team). Therefore, the trial court here erred as a matter of law by failing to consider the good-faith exception to the exclusionary rule where the police executed an inactive warrant.

However, despite the trial court's refusal to consider the good-faith exception, the court nonetheless made factual findings about the officers' actions, suggesting it did in fact consider the exception. Specifically, the court noted that the officers acted reasonably "given the state of their knowledge about the warrant" and Officer Krippel had a reasonable concern for officer safety. Whether the good-faith exception applies in the first instance is purely a question of law reviewed *de novo*. *People v. Walensky*, 286 Ill. App. 3d 82, 92, 675 N.E.2d 952, 959 (1996). However, a trial court's factual findings relevant to an officer's good faith will be accepted unless they are against the manifest weight of the evidence. *Walensky*, 286 Ill. App. 3d at 92, 675 N.E.2d at 959. Once a defendant proves a violation of the fourth amendment, the State has the burden to prove the good-faith exception applies. *People v. Turnage*, 162 Ill. 2d 299, 309, 313, 642 N.E.2d 1235, 1239-40 (1994) (focusing on conduct of an officer who procured a repetitive warrant and signaled its continued validity rather than the officer who executed it).

In this case, the State failed to meet its burden of proof that the good-faith exception should apply, and exclusion was the proper

remedy. The first consideration in determining whether the exclusionary rule should apply—misconduct by the police—clearly applies here. See *Herring II*, 555 U.S. at 144, 172 L. Ed. 2d at 507, 129 S. Ct. at 702 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system"). Although the trial court found the officers acted reasonably and without any negligence, that conclusion was against the manifest weight of the evidence. The officers testified that they typically obtained a warrant list printed the same day as their visit to the police department. In this instance, they knew they were relying on a warrant list that was up to three days old. They made no attempt to verify the continued existence of the warrant before approaching defendant's residence. Doing so apparently would have indicated that the warrant was inactive. Deputy Brooke testified that less than five minutes passed between obtaining the warrant list and arriving at defendant's house. The events at defendant's house appeared to have occurred over a short period of time. Nonetheless, when Deputy Brooke called the communications center, LivCom, he immediately learned the warrant was no longer valid. The reliance on the old warrant list and the failure to check on the continued validity of the warrant constituted, at the very least, gross negligence, if not reckless or wilful misconduct. See, *e.g.*, *Herring II*, 555 U.S. at 144, 146, 172 L. Ed. 2d at 507, 508, 129 S. Ct. at 702, 703 (noting that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence" but concluding that the failure to update the warrant system was not "so objectively culpable as to require exclusion"); *Michigan v. Tucker*, 417 U.S. 433, 447, 41 L. Ed. 2d 182, 194, 94 S. Ct. 2357, 2365 (1974) ("The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in wilful, or at the very least negligent, conduct which has deprived the defendant of some right").

The second condition necessary to warrant application of the exclusionary rule—whether application of the rule would result in appreciable deterrence—also applies here. See *Herring I*, 492 F.3d at 1217 (listing the "three conditions that must occur to warrant application of the exclusionary rule"). Unlike court employees, as was the case in *Evans*, police officers are the very actors the exclusionary rule was meant to deter. See, *e.g.*, *People v. Boyer*, 305 Ill. App. 3d 374, 379, 713 N.E.2d 655, 658 (1999) (applying the exclusionary rule where the prosecutor failed to get a stale warrant recalled, noting that excluding the evidence would deter similar constitutional violations). Moreover, the officers' reliance on an up-to-three-day-old warrant list is conduct that can be deterred.

Third, the deterrent benefit of excluding the evidence outweighs the social costs. Specifically, the cost of excluding the evidence is outweighed by the strong deterrent effect of exclusion. See, *e.g.*, *Herring II*, 555 U.S. at 144, 172 L. Ed. 2d at 507, 129 S. Ct. at 702 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system").

This would be an entirely different case had the officers obtained the current warrant list that contained defendant's name and executed it without verifying the warrant. It also would have been a different case if the officers had obtained the up-to-three-day-old list, called to verify, and been told that the warrant was valid. It is entirely reasonable to assume that defendant's name might have remained on the list that evening when he had only posted bail that morning. In such case, the police officers would not be at fault. However, those are not the facts of this case. This case involves a situation where the officers knowingly obtained an up-to-three-day-old list and did not verify the continued validity of defendant's warrant, even though their standard police procedure was to obtain a current list. The officers provided no explanation during their testimony why they accepted an old list, failed to request a newer list, and failed to verify the continued validity of the warrants on the list. The United States Supreme Court has held that the analysis of deterrence and culpability is objective. *Herring II*, 555 U.S. at 145, 172 L. Ed. 2d at 507, 129 S. Ct. at 703. A reasonable officer would not have relied on a three-day-old warrant list without having confirmed its continued validity.

This court also notes that the police officers' behavior suggests more than simple negligent conduct. At 8:30 or 9 p.m., officers from Livingston County and Fairbury—both some distance from Streator— obtained a warrant list from the police department that they knew was not current. Notably, the State's Attorney, when contacted by the officers about arresting defendant, told the officers not to arrest defendant and to leave the house.

Further, the facts here are distinguishable from similar cases finding that the exclusionary rule should not apply. In *Herring II*, 555 U.S. at 137, 172 L. Ed. 2d at 502, 129 S. Ct. at 698, police officers in one jurisdiction checked with the warrant clerk in another law-enforcement agency and were told that the defendant had an outstanding arrest warrant. The officers arrested the defendant. *Herring II*, 555 U.S. at 137, 172 L. Ed. 2d at 502, 129 S. Ct. at 698. A search incident to arrest revealed methamphetamine and a pistol. *Herring II*, 555 U.S. at 137, 172 L. Ed. 2d at 502, 129 S. Ct. at 698. Shortly thereafter, the of-

ficers learned that the warrant had actually been recalled five months earlier. *Herring II*, 555 U.S. at 138, 172 L. Ed. 2d at 502, 129 S. Ct. at 698. The United States Supreme Court held that "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" *Herring II*, 555 U.S. at 147-48, 172 L. Ed. 2d at 509, 129 S. Ct. at 704, citing *Leon*, 468 U.S. at 907 n.6, 82 L. Ed. 2d at 688 n.6, 104 S. Ct. at 3413 n.6.

In contrast here, it was not the officers' reliance on the warrant sheet from another county that led them to mistakenly arrest defendant. It was their own conduct in relying on an up-to-three-day-old warrant list without making any effort to check the continued validity of the warrant. This is the type of "reckless disregard" the Supreme Court noted would justify exclusion of the evidence. See *Herring II*, 555 U.S. at 147, 172 L. Ed. 2d at 509, 129 S. Ct. at 704. Excluding the evidence here would in fact deter such conduct. Officers cannot be wilfully blind to the facts and then claim a good-faith reliance precludes suppression of the evidence.

### D. Neither Consent Nor Exigent Circumstances Justified the Warrantless Entry Into the Home

The State also urges this court to find the entry into the house lawful because the officers reasonably believed they had a valid warrant *and* (1) they entered with consent or (2) exigent circumstances justified the entry. The State argues that because the officers lawfully entered the home and pursued defendant as he ran upstairs, they lawfully saw the rock of crack cocaine in plain view.

As noted above, however, the trial court's conclusion that the officers acted reasonably in their execution of the invalid arrest warrant was against the manifest weight of the evidence. Therefore, this court will consider only whether the officers entered with consent or whether exigent circumstances justified the warrantless entry into the home.

"The physical entry of the home is the chief evil against which the wording of the fourth amendment is directed." *People v. Wear*, 229 Ill. 2d 545, 562, 893 N.E.2d 631, 641 (2008). Absent certain limited situations, including consent or exigent circumstances, the fourth amendment prohibits warrantless entries into a person's home regardless of whether it is to effect an arrest or to search for evidence of crime. See *Payton v. New York*, 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382 (1980) (exigent circumstances); *Illinois v. Rodriguez*, 497 U.S. 177, 181, 111 L. Ed. 2d 148, 156, 110 S. Ct. 2793, 2797 (1990) (voluntary consent); *People v. Lawson*, 119 Ill. App. 3d 42, 49, 456

N.E.2d 170, 174 (1983) (absent exigent circumstances or voluntary consent, the police officer's entry into the defendant's home was unlawful).

### 1. *Trial Court's Determination That Senior Did Not Consent Was Not Against the Manifest Weight of the Evidence*

The trial court specifically held that Senior did not consent to the officers' entry into the residence. Again, this court will accept the trial court's factual findings unless they are against the manifest weight of the evidence. *Gherna*, 203 Ill. 2d at 175, 784 N.E.2d at 805.

Here, the trial court's conclusion that Senior did not consent is supported by the evidence. Senior testified he did not consent. Neither officer testified that Senior expressly consented. Deputy Brooke was not present when the other officers knocked on the door. Officer Krippel testified that Senior did not invite them in. Deputy White did not testify.

The State, citing *People v. Petersen*, 110 Ill. App. 3d 647, 654, 442 N.E.2d 941, 947 (1982), argues that Officer Krippel's testimony showed that Senior consented. The State apparently refers to Officer Krippel's testimony that when he and Officer White told Senior they needed to speak to defendant, Senior turned around and walked into the residence, leaving the door open. Those facts, however, differ from those present in *Petersen*.

In *Petersen*, both the defendant and the officer testified that when the defendant saw the officer at the door, he "opened the door to admit the officer and stepped back a few paces so [the officer] could enter." *Petersen*, 110 Ill. App. 3d at 654, 442 N.E.2d at 947. The *Petersen* court concluded the defendant's actions were intended as an offer of permission to enter the home. *Petersen*, 110 Ill. App. 3d at 654, 442 N.E.2d at 947.

In this case, even accepting Officer Krippel's testimony as true, Senior at most turned around to get defendant. Office Krippel testified that when he and Officer White asked to speak to defendant, Senior turned around. Senior testified he tried to shut the door before he went to get defendant. The testimony does not suggest he stepped back to admit the officers into the home. Moreover, Officer Krippel testified that he heard Officer White ask "can we come in" as they entered the residence and also testified he heard Senior say, "I didn't tell you you could come in." On these facts, the trial court's conclusion that Senior did not consent to the officers' entry into the home is not against the manifest weight of the evidence.

### 2. *Exigent Circumstances Did Not Justify the Warrantless Entry*

The State also argues exigent circumstances justified the officers'

warrantless entry into the residence. Specifically, the State asserts that defendant's unprovoked flight gave Officer Krippel reasonable concern for officer safety and justified entry into the home. The State asserts that the officers saw the cocaine in plain view when they caught up with defendant and, therefore, lawfully seized the cocaine.

This court will accept the trial court's factual findings on the existence of exigent circumstances unless those factual findings are clearly erroneous. See *People v. Johnson*, 368 Ill. App. 3d 1073, 1083, 859 N.E.2d 153, 163 (2006) (if facts and credibility are undisputed, the question of whether exigent circumstances exist is reviewed *de novo*); *People v. Patterson*, 267 Ill. App. 3d 933, 940-41, 642 N.E.2d 866, 871 (1994) (where the facts and credibility are disputed, this court will not disturb the trial court's determination on exigent circumstances unless clearly erroneous); but see *United States v. Davis*, 290 F.3d 1239, 1241 (10th Cir. 2002) (holding that whether exigent circumstances exist is a mixed question of law and whether the facts constitute exigent circumstances is subject to *de novo* review).

The State bears the burden of demonstrating that exigent circumstances authorized the warrantless entry. *In re D.W.*, 341 Ill. App. 3d 517, 527, 793 N.E.2d 46, 53 (2003). "The State must present evidence of the specific facts available to the police officers that would warrant a person of reasonable caution to believe that the action taken was appropriate." *D.W.*, 341 Ill. App. 3d at 527, 793 N.E.2d at 54. The "cornerstone" of the analysis is whether the officers acted reasonably. Whether circumstances are exigent depends upon an examination of the totality of the circumstances. *People v. Tillman*, 355 Ill. App. 3d 194, 198, 823 N.E.2d 117, 121-22 (2005).

The State argues that defendant's flight upon seeing Officer Krippel justified the entry into the home for "officer safety," and notes the trial court found Officer Krippel was reasonable in his concern for officer safety and pursuit of defendant up the stairs. The State asserts that it is lawful for an officer to pursue and briefly detain a person whose unprovoked flight occurs in a known, high-crime area. *Illinois v. Wardlow*, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576, 120 S. Ct. 673, 676 (2000). The State also asserts, without authority, that "[s]urely it is at least as reasonable for officers to pursue, without hesitation or inquiry, an individual named in an arrest warrant who flees when they knock on his door and announce their presence."

Unprovoked flight upon seeing a police officer can be a factor in determining whether an officer had reasonable suspicion to briefly detain an individual. See, *e.g.*, *Wardlow*, 528 U.S. at 123-24, 145 L. Ed. 2d at 576, 120 S. Ct at 676 (finding police officers had reasonable, articulable suspicion that the defendant was involved in criminal activ-

ity where the defendant was in an area known for heavy narcotics trafficking and took flight upon seeing the police officers); *United States v. Quinn*, 83 F.3d 917, 921-22 (7th Cir. 1996) (noting that flight from a police officer, while not necessarily enough standing alone, is a relevant and probative factor in establishing reasonable suspicion). A police officer can also, in some circumstances, enter a person's home without a warrant to arrest an individual if the officer has probable cause to arrest the individual in a public place but the individual flees into his home (hot pursuit). See, *e.g.*, *Wear*, 229 Ill. 2d at 563, 893 N.E.2d at 644-45; but see *D.W.*, 341 Ill. App. 3d at 528-29, 793 N.E.2d at 54-55 (finding that a juvenile's flight into his home when police officers approached him and motioned to him did not constitute exigent circumstances that permitted the officers to make a warrantless entry into the home to conduct an investigatory stop; the officers did not know what, if any crime, was being committed, and the officers had no reason to believe that the juvenile would have escaped, attempted to destroy evidence, or was armed and dangerous).

However, to make a warrantless arrest inside the defendant's home on the ground of exigent circumstances, the officers must have probable cause. See *Wear*, 229 Ill. 2d at 568, 893 N.E.2d at 645 (considering first whether the officer had probable cause to arrest the defendant outside the residence and then considering whether the warrantless, nonconsensual entry into the defendant's home was permitted under exigent circumstances); *People v. Williams*, 383 Ill. App. 3d 596, 625, 891 N.E.2d 904, 926 (2008) (noting that, generally, police may not enter a private residence and effectuate an arrest unless they have a warrant, resident consent, or probable cause coupled with exigent circumstances). In addition to requiring that the officers act on a clear showing of probable cause, other factors relevant to determining whether exigent circumstances permit a warrantless entry into a private residence to effectuate an arrest include whether (1) the crime under investigation was recently committed; (2) the police made any deliberate or unjustified delay during which time a warrant could have been obtained; (3) a grave offense, such as a crime of violence, was involved; (4) the police officers had a reasonable belief that the suspect was armed; (5) the suspect would escape if he were not swiftly apprehended; (6) the police officers had a strong reason to believe the suspect was in the premises; and (7) the police entry was made peaceably, albeit without consent. See *D.W.*, 341 Ill. App. 3d at 527, 793 N.E.2d at 54.

In this case, the record is devoid of any indication that the officers had probable cause to believe defendant committed or was committing an offense. The record contains no evidence that the officers were

investigating a crime or that a "grave offense" was involved. Moreover, the record contains no evidence that the officers believed defendant was armed and dangerous. In fact, although Officer Krippel testified he had seen defendant before, he had never had any one-on-one dealings with him and did not testify as to any particular knowledge about defendant, such as a propensity for violence. Although the officers knew defendant was on the premises, he was not likely to escape, as the three officers had surrounded the house.

The State argues that defendant's flight upon seeing Officer Krippel justified the entry into the home for "officer safety." However, the record is devoid of any facts supporting Officer Krippel's concern for safety. The record does not indicate the basis for the original (inactive) arrest warrant. The officers did not testify that they had any knowledge that defendant was violent, dangerous, or had weapons in the home. Without the arrest warrant, all the officers knew was that when defendant saw Officer Krippel at the front of the residence, defendant ran upstairs. This is insufficient as a matter of law to justify a warrantless entry into defendant's home. See, *e.g.*, *People v. Klimek*, 101 Ill. App. 3d 1, 6, 427 N.E.2d 598, 602 (1981) (finding no exigent circumstances justifying a warrantless entry where, among other reasons, the officers had no reason to believe the defendant was armed and he was not accused of committing a violent crime or one involving a weapon). The trial court's conclusion that Officer Krippel was reasonable in feeling a concern for officer safety was against the manifest weight of the evidence because on the facts of this case, a person of reasonable caution would not believe such action was appropriate. See, *e.g.*, *D.W.*, 341 Ill. App. 3d at 527, 793 N.E.2d at 54 (articulating the standard for exigent circumstances as whether the facts available to the officers would "warrant a person of reasonable caution to believe that the action taken was appropriate").

The State points out that primary consideration in a fourth-amendment analysis is "reasonableness" and argues the police officers acted reasonably, as the trial court found. As noted previously, the record does not support the trial court's conclusion. Taking away the officers' reliance on the (inactive) arrest warrant, the officers had no basis to enter defendant's home. See, *e.g.*, *People v. Day*, 165 Ill. App. 3d 266, 268, 519 N.E.2d 15, 17-18 (1988) (finding the warrantless entry not justified based on exigency solely on the facts that the arrest took place almost immediately after the crime, the officers believed the defendant was on the premises, and the officers entered peaceably where the defendant was not suspected of a crime of violence and the officers had no evidence the defendant was armed or dangerous).

## E. Remand on *Miranda* Issue Not Required

Because this court affirms the trial court's order granting the motion to suppress, this court need not remand the cause to the trial court for a hearing on the *Miranda* issue. The statements were properly suppressed for the reasons stated by the trial court.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

McCULLOUGH, P.J., and STEIGMANN, J., concur.