# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Dawn*, 2013 IL App (2d) 120025

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MYRON D. DAWN, Defendant-Appellant. |
| District & No. | Second District <br> Docket No. 2-12-0025 |
| Filed <br> Rehearing denied | August 6, 2013 <br> August 30, 2013 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Consent by defendant's sister to allow a police officer and other armed and masked officers to enter her house to talk to her about a complaint of drug activity at her house did not extend to allowing the other officers to follow defendant, who had been staying at the house and was standing nearby, when he went to the basement, and in the absence of a warrant, probable cause or exigent circumstances that would justify the officers' intrusion into the basement, the drugs discovered there should have been suppressed pursuant to defendant's motion; therefore, defendant's conviction for unlawful possession of a controlled substance with intent to deliver within 1,000 feet of residential property owned by a public housing agency was revesed. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 09-CF-1694; the Hon. Ronald J. White, Judge, presiding. |
| Judgment | Reversed. |

| Counsel on Appeal | Thomas A. Lilien and Christopher McCoy, both of State Appellate Defender's Office, of Elgin, for appellant. |
|---|---|
| | Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Matthew J. Schmidt, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion. Justices Schostok and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a jury trial, defendant, Myron D. Dawn, was convicted of possessing, with the intent to deliver, cocaine (720 ILCS 570/401(d) (West 2008)) within 1,000 feet of residential property owned, operated, or managed by a public housing agency (720 ILCS 570/407(b)(2) (West 2008)). He was sentenced to 15 years' imprisonment. On appeal, he argues that the trial court erred in denying his motion to suppress evidence that the police seized after entering the home of his sister, Quanda Dawn, and following defendant into the basement. Defendant argues that the police exceeded the scope of Quanda's consent to their warrantless entry. We reverse.

¶ 2    We summarize the evidence at the hearing on defendant's motion to suppress. Quanda testified on direct examination as follows. At all pertinent times, she resided at 1603 Burton in Rockford with her son and daughter. As of June 4, 2009, defendant had been staying there for about a month; he was not there all the time, but he was always welcome. Defendant slept in the basement and kept "[a] lot of [his] stuff" there. At about 9 p.m. that night, as she lay in bed, Quanda heard someone at the side door, so she walked into the kitchen. Defendant was standing inside the side door and a Rockford police detective, Robert Reffett, was outside the door.[1] Quanda saw no other people. Reffett asked Quanda whether she lived there; she said yes. Quanda testified, "He said to me that he needed to talk to me–well, he might have said he needed to talk to me or could he talk to me. And when he said that, I said 'sure, come on in,' because I was half-presentable in clothes, so I invited him on in."

¶ 3    Quanda testified that, after she "had [taken] like two little steps going up to her kitchen," on the way to the living room, she heard other people enter and saw defendant go down the stairs toward the basement. He was walking slowly. Three or four men, dressed in black and wearing masks, were following him. Quanda had not invited them in; she had not even

---

[1]Quanda testified that the officer who spoke to her was a police "sergeant," but the parties agree that she was mistaken in this regard.

-2-

known that they had been there. The men said nothing to her. Quanda escorted Reffett to the living room, where they talked. He said that an alderman had relayed complaints that drug activity was going on in her home.

¶ 4 Quanda testified on cross-examination as follows. Before the police entered the home, Reffett had not told her the purpose of the visit. She and Reffett had gotten partway into the kitchen when she saw the other men enter and go straight downstairs. Quanda explained to Reffett that defendant stayed with her only two or three days a week. She added that recently a young woman had come to her door and asked, "Do y'all got some weed?" Quanda related that she told the woman that nothing like that went on in her home and the woman apologized and left.

¶ 5 Defendant testified as follows. As of June 4, 2009, he had been staying in Quanda's home and was keeping his clothing and a computer there. After Reffett and Quanda started talking at the door, defendant saw no reason to stay. He went downstairs to watch the NBA playoffs in the computer room, where Quanda's daughter was sitting. As he reached the bottom of the stairs, three or four men started descending the stairs. All were dressed in black and one or two were masked. Defendant soon realized that they were police officers. One officer asked defendant whether he had any weapons. Defendant said no, and, to prove it, he lifted up his shirt, then unbuckled his pants and let them drop. An officer told defendant to pull up his pants, which he did. The officer then handcuffed defendant, and several officers went through his pockets.

¶ 6 The State first called Reffett, who testified on direct examination as follows. On the evening of June 4, 2009, he went to 1603 Burton, accompanied by Sergeant Randy Berke and three other detectives: Rossow, Veruchi, and Wassner. All wore vests labeled "Police." Reffett, Rossow, and Veruchi accompanied Berke to a side door as Wassner went to the rear of the building. Reffett knocked on the door. Defendant answered. Reffett identified himself and asked to speak with defendant. Defendant told him to wait a second; at that time, Quanda came to the door. Reffett again identified himself and "asked if [he] could speak with her for a moment." Quanda asked what the visit was about. Reffett explained that the police had received a complaint about possible drug sales from the home. "Pretty much just as [Reffett] ended [his] sentence," defendant turned around and started walking toward the basement. Quanda then said, "Please come in, I'd like to talk to you about this." She did not limit the invitation to Reffett. At the time, Berke, Rossow, and Veruchi were standing "directly behind" Reffett, "just right off the side." Reffett followed Quanda to the kitchen, then to the living room.

¶ 7 Reffett testified on cross-examination as follows. The police did not have a warrant. Shown his police report, Reffett conceded that he had asked Quanda whether "I" could talk to her, not whether "we" could do so. At the time, Berke and Rossow had been standing directly behind him, with Veruchi off slightly to his left. Reffett explained to Quanda that the police were responding to a narcotics complaint. He never said, "I [or "We"] want to search your home." Defendant walked down the stairs; he did not run or make furtive movements, and Reffett saw no weapons or contraband on him. Reffett testified, "The only weird thing about that is as soon as I told Quandra [*sic*] I want[ed] to talk to her about possible illegal drugs were [*sic*] being sold from the residence, [defendant] immediately turned and started

walking down the stairs."

¶ 8     Reffett testified on redirect examination that, in his police report, he had written, " 'I asked if I could speak with her for a moment,' " but had also written, " 'Quandra [*sic*] Dawn asked what we want [*sic*] to speak to her about.' " Once Reffett and Quanda were inside, she told him that defendant stayed there two or three times a week. She added that, after the incident with the woman who wanted to buy "weed," she asked defendant whether he knew the stranger and whether he was "selling anything out of the house." Quanda related that "she became suspicious at that point."

¶ 9     Rossow testified as follows. When Reffett got to the side door, Rossow was standing almost directly behind him, just off to the left, no more than two feet away. Rossow's clothing included a vest marked "Police" and a mask. Berke and Veruchi were also standing near Reffett. Reffett knocked on the door. Defendant answered. Reffett identified himself and asked "if [the officers] could speak to him." Defendant told him to hold on a second, but within moments Quanda came to the door. Reffett again identified himself and asked "basically if we could speak to her for a moment." She asked "what we wanted to speak to her about," and he explained that "we" had gotten a "narcotics complaint at that residence and want [*sic*] to speak to her about that." Quanda said, " 'Please come in.' " Rossow did not recall whether Quanda actually used the term "we." However, Rossow, Berke, and Veruchi were standing "right in front of the *** door," and Rossow could not imagine how she could not have seen them.

¶ 10     Rossow testified that, "almost immediately after" Reffett explained that the police wanted to talk to Quanda about suspected drug activity, defendant walked away and went down the stairs. Rossow, Berke, and Veruchi followed him into the basement. There was "like a landing and then the landing went up to a kitchen area *** and then it went down to the basement." There were "some couple stairs [*sic*] that went up into the kitchen area," but Rossow, along with Berke and Veruchi, "went from *** that door down into the basement." When they entered, defendant was "still on the stairwell." Rossow, concerned for his safety, asked defendant several times, " 'Hey, can I speak to you?' " Defendant, as he descended the stairs, responded each time that he was " 'just going to watch the game.' " He was sweating, shaking, and looking around. In the basement, he removed his jacket and put it onto a small ledge. Rossow asked defendant whether anyone else was in the basement. Defendant said no, but Veruchi found Quanda's daughter in the computer room.

¶ 11     Rossow testified that, when defendant reached the bottom of the stairs, Rossow asked defendant whether he had any weapons and whether Rossow could search him. Defendant said that he had no weapons and that the officers could search him. He immediately undid his belt, unbuttoned his pants, and let them drop to his ankles. Rossow told him to pull his pants back up. As defendant did so, Berke picked up an object off the floor and said in police code that he had located apparent drugs. Berke then handcuffed defendant. A search of defendant's person yielded suspected contraband.

¶ 12     Rossow testified that he was sure that Quanda saw him before saying " 'Come in,' " as all the officers had been standing "right in front of the *** door." It appeared that, when Quanda said, " 'Come in,' " she was inviting in all of the officers. Apparently, she wanted

to clear up the drug complaint. No officer asked permission to enter the basement. Rossow did not ask whether he could search the residence, and he did not recall whether anyone else did.

¶ 13    Berke testified as follows. On June 4, 2009, he and the detectives went to 1603 Burton in response to a drug complaint that the police had "recently" received "through an alderman." As best as he could recall, the alderman had not mentioned any names in connection with the alleged drug dealing. When Berke reached the door, Rossow and Reffett were with him and Veruchi was "near us as well." Berke was standing "[r]ight to [Reffett's] side, maybe just a tad bit behind him." He had on a vest with "Police" on the front and back. Reffett knocked on the door. Defendant answered. Reffett identified himself and asked to speak to defendant for a moment. Defendant said to hold on a moment, but at that time Quanda came to the door. Reffett identified himself and asked to speak to her. Quanda asked, "What do you want to talk about?" Reffett said that the police had been receiving complaints that someone might be selling drugs out of the house.

¶ 14    Berke testified that, upon hearing Reffett's explanation, Quanda seemed "really concerned," said " 'Please come in,' " and "invited us in." She "had the attitude that she wanted to find out what this [was] about." Quanda did not invite only Reffett inside. She did not tell the other officers to wait outside. Nothing obstructed her view of Berke, Rossow, and Veruchi.

¶ 15    Berke testified that, "[a]lmost immediately upon hearing the word drugs," defendant turned around and began to go down the stairs. He started almost simultaneously with Quanda's " 'Please come in.' " Berke, Rossow, and Veruchi followed defendant downstairs. When Rossow asked defendant whether he had any weapons on him, defendant said that Rossow could search him, and he dropped his pants to the floor. Rossow told defendant to pull his pants back up, and, as defendant did so, Berke saw what looked like crack cocaine fall out. Defendant was arrested and searched. A search of his coat, which he had removed earlier, turned up baggies with corners missing, an indicator of narcotics packaging.

¶ 16    The court heard argument on defendant's motion to suppress. Defendant contended that the warrantless entry into the basement, without probable cause, was presumptively unreasonable. Further, it could not be validated by consent; Quanda had allowed only Reffett inside, in order to speak to her. She would not have consented to the other officers, including men wearing masks, entering the basement while her young daughter was there. Also, defendant had posed no danger, and his mere walking away did not allow Berke, Rossow, and Veruchi to enter the basement.

¶ 17    The prosecutor responded in part that the State's witnesses testified credibly that Quanda could see all of the officers and thus had known that they were all present when she said to "come in." Moreover, Reffett had used "we" in his report's summary of Quanda's response to his request to enter. Therefore, the officers who followed defendant downstairs had had the authority to do so, via "[c]onsent to enter the residence through Quanda." The prosecutor did not contend that the officers had had probable cause or even a reasonable suspicion to believe either that defendant was committing a crime or that he threatened their safety. In reply, defendant reiterated that Berke, Rossow, and Veruchi had entered the basement

illegally, making inadmissible anything seized as a result. Further, defendant argued, his mere act of turning and going down the stairs did not raise safety concerns that could have validated the entry.

¶ 18     The trial court denied defendant's motion to suppress. The judge found that, just after Reffett asked Quanda to speak with him about the reports of drugs being sold from her home, she invited all the officers in. Essentially simultaneously, defendant turned and went down the stairs. The judge noted that Rossow had testified that "we" had told Quanda why "we" were there and that the officers had been standing where Quanda could have seen them all. Thus, Quanda, who had recently encountered a stranger asking to buy drugs and had become suspicious of defendant, became genuinely concerned when Reffett told her the purpose of the visit. Next, the judge concluded that, in essence, there had been "no search" of defendant; the drugs had fallen out of his pants and were in plain view when Berke picked them up, providing probable cause to arrest defendant.[2] After defendant was tried and convicted, he moved for a new trial, claiming error in the denial of his motion to suppress. The court denied the motion, sentenced defendant as noted, and declined to reconsider the sentence. Defendant timely appealed.

¶ 19     On appeal, defendant contends that the trial court erred in denying his motion to suppress, because the evidence seized was the product of a fourth amendment violation–the warrantless entry of Berke, Rossow, and Veruchi into the basement of Quanda's home. Defendant notes that Quanda did consent to the entry of one or more officers into her home, but he contends that the officers who pursued him down the stairs into the basement exceeded the scope of Quanda's consent. The State responds that the trial court properly found that Quanda knowingly and freely invited all four policemen into her house, thus legitimating the entry of Berke, Rossow, and Veruchi into the basement, and that the entry into the basement was validated by exigent circumstances.

¶ 20     In reviewing the trial court's ruling on a motion to suppress, we accept the court's factual findings unless they are against the manifest weight of the evidence, but we consider *de novo* the ultimate question of whether suppression was proper. *People v. Johnson*, 237 Ill. 2d 81, 88-89 (2010). This case involves a warrantless entry into a residence. The fourth amendment prohibits unreasonable searches and seizures. U.S. Const., amend. IV. The physical entry of the home is the chief evil against which the wording of the fourth amendment is directed. *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984); *People v. Wear*, 229 Ill. 2d 545, 562 (2008). Therefore, a search or seizure inside a home is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980); *Wear*, 229 Ill. 2d at 562. Thus, we must decide whether, accepting the trial court's factual findings insofar as they are not against the manifest weight of the evidence, we can say that the State overcame the presumption of unconstitutionality in this case.

---

[2]A separate issue was whether the police had properly searched a duffel bag after they arrested defendant. The court did not decide this issue at the hearing but later held that the evidence seized from the duffel bag was admissible. Defendant contends that the search of the duffel bag was the product of the allegedly illegal entry into the basement, so that the evidence obtained as a result of that search should also have been excluded.

¶ 21    The State posits two grounds on which to affirm the trial court's conclusion that the three officers' entry into the basement was proper.[3] The first we address is "exigent circumstances." The State contends that the "*possibility* of narcotics destruction" (emphasis added) justified the warrantless intrusion. The State relies on the evidence that, as soon as Reffett mentioned that the police were investigating possible drug activity in the home, defendant turned and walked downstairs. The State does not contend that the officers had probable cause, or even a reasonable suspicion, that defendant had or was about to destroy narcotics. Assuming for purposes of this appeal that we may affirm the judgment on a ground that was not raised or argued in the trial court (see *Kravis v. Smith Marine, Inc.*, 60 Ill. 2d 141, 147 (1975)), we reject the State's argument.

¶ 22    As defendant observes, the fatal flaw in the State's argument is that "exigent circumstances" by themselves do not validate a warrantless entry into a home. The fourth amendment does not require a warrant "where it is shown that there are exigent circumstances excusing the need to obtain the warrant. However, the police must still have probable cause to undertake the search." *People v. James*, 163 Ill. 2d 302, 311-12 (1994). As we have held, "nonconsensual, warrantless entries into private premises are *per se* unreasonable absent *probable cause coupled with exigent circumstances.*" (Emphasis added.) *People v. Hilgenberg*, 223 Ill. App. 3d 286, 291 (1991). "Under the Fourth Amendment, a warrantless intrusion into a person's home is presumptively unreasonable unless the person consents, or unless probable cause *and* exigent circumstances justify the intrusion." (Emphasis added.) (Internal quotation marks omitted.) *Rockwell v. Brown*, 664 F.3d 985, 994 (5th Cir. 2011) (quoting *Gates v. Texas Department of Protective & Regulatory Services*, 537 F.3d 404, 420 (5th Cir. 2008), quoting *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007)); see also *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002).

¶ 23    The State contends that the requirement of both exigent circumstances *and* probable cause is limited to when the police enter the home in order to effect an arrest. Not only does the State cite no pertinent authority for this limitation, and fail to address the aforementioned authority to the contrary, but it ignores the Supreme Court's clear instruction otherwise. Rejecting the proposition that "an entry to search for property" should be recognized as less intrusive than "an entry to search for a person" (*Payton*, 445 U.S. at 589), the Court explained, "[T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. *** In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house" (*id.* at 589-90).[4]

---

[3]Defendant does not assert that, and we do not decide whether, anything that the officers did after the disputed entry independently violated defendant's fourth amendment rights.

[4]Moreover, in arguing that the entry of Berke, Rossow, and Veruchi into the basement was justified by the danger that defendant would destroy evidence of a crime, the State implicitly concedes that the entry *wa*s a search for a person–which is undeniable anyway. The officers followed defendant after he turned and walked toward the basement. There was no evidence that, until then, they had had any intention to search the home for evidence of a crime.

¶ 24    The importance long accorded the privacy of the home would mean little if a warrantless entry could be justified solely by the "possibility" of finding evidence of a crime where the police can only guess as to what actually happened. As the preceding authority holds, the fourth amendment does not make entry into the home so easy. Since the State does not even argue that the police had probable cause, we shall not make the State's case for it. In any event, the most we can say is that Berke, Rossow, and Veruchi had a hunch that defendant had been involved in the suspected drug dealing mentioned in the alderman's nonspecific, secondhand complaint. A mere hunch is not probable cause. *People v. Ortiz*, 355 Ill. App. 3d 1056, 1064 (2005).[5] And if the officers lacked probable cause to believe that defendant had drugs, then they could only speculate that he was about to destroy them. Thus, the State's exigent-circumstances argument fails.

¶ 25    We wish to emphasize that, at the trial level, the State did not raise officer safety as a basis to find exigent circumstances, and the State does not advance the argument in this court either. In any event, the evidence would not support any assertion that the officers' entry into the basement was proper under the exigent-circumstances rule because defendant threatened their safety. See *People v. Condon*, 148 Ill. 2d 96, 103 (1992); *People v. Morgan*, 388 Ill. App. 3d 252, 269 (2009) (both noting that threat to officer safety might create exigent circumstances).

¶ 26    The officers did not testify that they entered the basement because they feared that defendant had a weapon or otherwise threatened them. Rossow did testify that, *after* he entered the basement, he became concerned for his safety, but his testimony did not explain the basis for his concern. There was no evidence that defendant was armed at the time or that, even if a weapon had been in the basement, the officers could reasonably have assumed that he would have used it. See *Condon*, 148 Ill. 2d at 105-06 (existence of weapon, by itself, did not create exigent circumstances allowing police executing search warrant to dispense with knock-and-announce requirement); *Morgan*, 388 Ill. App. 3d at 271 (exigent circumstances did not exist merely because defendant, upon seeing police officers at front of home, turned around and ran up flight of stairs).

¶ 27    We turn to the primary issue on appeal: whether the trial court erred in holding that Quanda's consent validated the entry of Berke, Rossow, and Veruchi into the basement of her home. Again, we note that we must accept the trial court's factual findings unless they are against the manifest weight of the evidence. *Johnson*, 237 Ill. 2d at 88. We accept the trial court's factual findings insofar as they are material to this appeal.

¶ 28    One salient dispute in arguments on the motion was whether Quanda's invitation, "Come in," was directed toward Reffett alone or toward all four police visitors at her door. Legally, however, the issue was not Quanda's subjective intent, but what a typical reasonable person in the officers' position would have believed from her exchange with Reffett. See *Florida*

---

[5]Although Quanda did tell Reffett that a woman had asked to purchase "weed" at her home and that she eventually suspected that defendant might have had something to do with the request, the record is clear that Quanda did not convey any of this information until well after Berke, Rossow, and Veruchi had entered the basement in pursuit of defendant.

*v. Jimeno*, 500 U.S. 248, 251 (1991). The trial court apparently found that Quanda intended to invite all of the officers into the home. Although the judge's discussion of the issue appears to have been misdirected–the crucial consideration was not Quanda's subjective intent but what the officers could have reasonably believed–the error was not important. The finding that Quanda invited all of the officers inside is supported by the consistent testimony of the State's witnesses that Berke, Rossow, and Veruchi were standing very near Reffett, so that Quanda must have been aware of them. A conclusion that Quanda invited all four officers inside is tantamount to a conclusion that Berke, Rossow, and Veruchi would reasonably have understood that they were being invited in. It would strain common sense to find that Quanda intended to invite all of them in but that a reasonable person in their position would not have felt invited. Also, even if Quanda was speaking specifically to Reffett, no authority requires "that express consent to enter be given each officer when the permission to enter is not expressly limited to the officer to whom it is given." *People v. Brown*, 162 Ill. App. 3d 528, 538 (1987).

¶ 29　In any event, defendant does not argue that the trial court erred in finding that Quanda's invitation was extended to all four of the policemen at her door. Instead, he contends that, even so, Berke, Rossow, and Veruchi exceeded the scope of that consent. Defendant contends that Quanda's invitation to enter her home in order to talk to her was not consent to the entry of Berke, Rossow, and Veruchi into the basement to pursue him. For the following reasons, we agree.

¶ 30　Because a warrantless entry into a home is presumptively unreasonable (*Payton*, 445 U.S. at 586), the burden was on the State to prove that the entry in this case fit within the consent exception to the warrant requirement. See *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *People v. Rushing*, 272 Ill. App. 3d 387, 390 (1995); *McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007). That burden extended not only to whether Quanda's consent was voluntary (not at issue here) but also to whether the police acted within the scope of that consent. See *United States v. Melendez*, 301 F.3d 27, 32 (1st Cir. 2002); *United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999). For the reasons that follow, we hold that the trial court erred in concluding that the State proved that the entry of Berke, Rossow, and Veruchi into the basement was within the scope of Quanda's consent to enter her home.

¶ 31　We note that there is some question as to whether the scope of consent is subject to *de novo* review or deferential review. See *Melendez*, 301 F.3d at 32. We are inclined to the former view, because the issue is whether a reasonable person in the three officers' position would have understood Quanda to have consented to their entry of the basement. This is a question not of what the evidence proved, but of how to apply a legal standard to a given set of facts, a decision ordinarily within the prerogative of the court of review. See *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006); *City of Champaign v. Torres*, 214 Ill. 2d 234, 241 (2005). However, even assuming that the trial court's ultimate findings on the scope of the consent are subject to deferential review, they are against the manifest weight of the evidence.

¶ 32　The scope of a person's consent must be measured objectively: what would the typical reasonable person have understood by the exchange between the police and the person giving consent? See *Jimeno*, 500 U.S. at 251; *People v. Baltazar*, 295 Ill. App. 3d 146, 149-50

-9-

(1998). Generally, the scope of a search is defined by its expressed object. *Jimeno*, 500 U.S. at 251. By stating his intended objective, the officer not only apprises the person that her constitutional rights might be affected but also informs her of the reasonable parameters of his inquiry. *Baltazar*, 295 Ill. App. 3d at 150.

¶ 33 As defendant notes, consent may be limited: "An invitation to enter one's home does not necessarily imply an invitation or consent to enter all areas of that home." *State v. Reagan*, 546 A.2d 839, 844 (Conn. 1988). To establish the scope of consent, it is important to consider any express or implied limitations or qualifications in regard to matters such as duration, area, and intensity. *Id.* at 845. Several cases illustrate these rules.

¶ 34 In *People v. Rodgers*, 96 Ill. App. 3d 416 (1981), the defendant came home and discovered that his wife had been attacked in their living room. He called the police. When they arrived, he and his wife told them that the assailant had not entered any other room. Nonetheless, the police searched the entire house. Nothing had been disturbed, but one officer opened a nightstand and discovered a shoebox containing drugs, leading to the defendant's arrest and eventual conviction. *Id.* at 416-17.

¶ 35 The appellate court reversed. The court explained that the defendant's invitation to the police to enter his home did not imply consent to enter areas not involved in the assault that had generated the invitation. Because the permission to enter was for the specific purpose of investigating a crime that had been confined to the living room, it was limited to that purpose and to that room. *Id.* at 418. At the very most, the police had had implicit permission to walk through the rest of the house without disturbing anything; but, upon finding nothing out of order, the officer who did the walk-through lost even that "tenuous authority to search." *Id.*

¶ 36 In *People v. Annerino*, 97 Ill. App. 3d 240 (1981), the defendant called the police to his home, reporting that a person had been shot inside. The police entered, saw the victim lying on the kitchen floor, and secured the crime area in the kitchen. During their investigation they entered the crawl space underneath the kitchen floor, through a small door in the lower level of the house. In the crawl space, they found both a bullet and some bags of marijuana. *Id.* at 240-41. The trial court granted the defendant's motion to suppress the marijuana. In affirming, the appellate court explained that, although the defendant had consented to the entry into his home, he had never expressly or implicitly consented to the search of the crawl space; specifically, his request for assistance in removing the victim from the kitchen could not be taken as implicit consent to the intrusion into the crawl space. *Id.* at 241-42.

¶ 37 In *Norris v. State*, 993 S.W.2d 918 (Ark. 1999), the court reversed the defendant's conviction of driving under the influence of alcohol, holding that his warrantless arrest inside his home violated the fourth amendment. The defendant's visiting mother-in-law, Ms. Wise, had admitted the officer through the front door. Once inside, the officer asked for the defendant; she went to his bedroom. The officer followed her into the bedroom, where he questioned and soon arrested the defendant. *Id.* at 399-401. The Arkansas Supreme Court held in part that, although Ms. Wise had had the apparent authority to consent to the officer's entry into the house (*id.* at 407), his actions had exceeded the scope of her consent.

¶ 38 The court noted that Ms. Wise did not verbally consent to the officer going down the hall and into the defendant's bedroom. The officer had testified that he did not perceive the initial

invitation as extending any farther than the living room and that Ms. Wise had never indicated that he should follow her. *Id.* Thus, Ms. Wise's invitation had been limited to the entry through the front door. *Id.* at 408. Also, her failure to object to the officer's actions could not be construed as implied consent to them. To do so would in effect presume consent and thus shift the burden to the defendant to prove that the officer acted without consent. *Id.*; see *United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996), *abrogated on other grounds*, *Davis v. United States*, 564 U.S. ___, ___, 131 S. Ct. 2419, 2428 (2011) (citing *Arizona v. Gant*, 556 U.S. 332 (2009)).

¶ 39 The general principles that we have cited, and their applications in the foregoing cases, compel us to hold that, in following defendant into the basement, apparently on the hunch that he was involved in some criminal activity, Berke, Rossow, and Veruchi exceeded the scope of Quanda's consent for them to enter her home. A reasonable person in their position would not have interpreted her request to "Come in" as including permission to pursue defendant into the basement, apparently in the hopes of finding incriminating evidence or obtaining incriminating admissions. This context shows fatal disjunctures of purpose, person, time, and place.

¶ 40 Regarding the request for entry and Quanda's response, all of the evidence was that Reffett asked to enter so that he and the other officers could *talk* to *Quanda* about suspected recent drug activity at her home. All of the evidence indicated that Quanda let the officers in for that expressed purpose. There is no evidence that either the request to enter or the consent that was granted was any broader. We measure the scope of "consent" in the same fashion that we measure any exception to the fourth amendment's warrant requirement. In *Florida v. Jardines*, 569 U.S. ___, ___, 133 S. Ct. 1409, 1415 (2013), the Supreme Court examined whether the "invitation or license" homeowners implicitly give to visitors who approach the front door permits police to bring a trained drug-sniffing dog along with them in the process. The Supreme Court said no. While a police officer may knock, like any private citizen might do, "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that." (Emphasis omitted.) *Id*. at ___, 133 S. Ct. at 1416. The scope of consent, like "[t]he scope of a license–express or implied–is limited not only to a particular area but also to a specific purpose." *Id.* at ___, 133 S. Ct. at 1416. In this case the police officers who followed defendant into the basement exceeded both the *area* and the *purpose* of the consent given by Quanda, thus intruding into a constitutionally protected area that they had no lawful authority to enter.

¶ 41 Quanda testified that Reffett said, "he needed to talk to me or could he talk to me." More important, the State's witnesses, whom the trial court found credible, corroborated her account and provided further evidence of the limited scope of her consent. Reffett testified (and wrote in his police report) that he " 'asked if [he] could *speak with her for a moment*.' " (Emphasis added.) He then testified that Quanda responded, " 'Please come in, *I'd like to talk to you about this*.' " (Emphasis added.) Further, Reffett did not request permission to search the home.

¶ 42 Reffett's account was corroborated by Rossow and Berke. Rossow testified that Reffett asked "basically *if we could speak to her for a moment*." (Emphasis added.) She asked "*what*

*we wanted to speak to her about*," and he explained that "we" had gotten a "narcotics complaint at that residence and *want* [*sic*] *to speak to her about that.*" (Emphases added.) Rossow also testified that no officer asked permission to enter the basement and that he did not ask permission to search the residence. Finally, Berke testified that Reffett told Quanda that the officers wanted to speak with her; that she asked what they wanted to talk about; and that, when Reffett explained, she let them in because "she wanted to find out what this [was] about." Thus, all of the testimony was that Reffett asked for permission to enter solely so that the officers could speak to Quanda "for a moment" about the complaints of drug activity. And all of the evidence showed that, as they recognized, Quanda allowed them in for only that purpose.

¶ 43    Under these circumstances, we are compelled to hold that the entry of Berke, Rossow, and Veruchi into the basement in pursuit of defendant exceeded the scope of Quanda's consent. All pertinent considerations point inexorably to this conclusion.

¶ 44    First, the "expressed object" (*Jimeno*, 500 U.S. at 251; see *Baltazar*, 295 Ill. App. 3d at 150) of the requested entry was to speak to Quanda. Quanda's response recognized this limited objective; she said, "I'd like to talk to you about this." Thus, she agreed to speak to the officers about the problem that Reffett had raised. The officers could not have reasonably believed that Quanda's words implied any willingness to allow them to pursue defendant (who had not consented to speak to the officers). The officers never asked her for permission to search the home or to do anything more than (1) *speak* to (2) *her*. Second, since Quanda followed up her words by entering the kitchen on the way to the living room, the officers could not have reasonably taken her invitation to come inside to speak to her *on the first floor* as permission to walk away and enter the basement. (Further, although the officers did not then know that Quanda's young daughter was in the basement, they did know that they were entering a residence at about 9 p.m., so that it was reasonably probable that people other than Quanda and defendant might be home–a prospect that cut against assuming that Quanda intended to permit any of the officers, all of whom were armed and at least one of whom was masked, to wander off out of her sight.) Third, the officers testified consistently that Reffett had requested permission to enter in order to speak to Quanda "for a moment." Although that request could not have been taken too literally, given the uncertainty of what the conversation might reveal, the suggestion of a short intrusion was manifestly inconsistent with the prospect of pursuing a person whom the officers suspected would have to be questioned, frisked, and even arrested.

¶ 45    Although *Rodgers*, *Annerino*, and *Norris* are not directly on point, all of them support our holding. In any event, we would reach the same conclusion even without this helpful authority. As *Rodgers* instructs, consent can be limited spatially and by the purpose of the entry; both limitations were present there, and are equally present here. Further, as *Annerino* holds, permission to enter one area, for an expressed purpose embodied in the invitation, does not imply permission to enter elsewhere, even if the further intrusion is motivated in some way by the concern that led to the initial entry. If the need to search for evidence relating to an actual homicide did not permit the officers in *Annerino* to extend their intrusion beyond what was requested and granted, then the possibility of finding evidence of a rumored offense, without even a claim of probable cause, did not permit the three officers here to go

in a different direction from Quanda after she granted their request to come inside to talk to her. Finally, *Norris* instructs that, even with probable cause, a limited invitation to enter a house does not permit an officer to pursue a suspect who is not within the area of consent. Notably, *Norris* also bars inferring consent from the mere failure to object. Of course, the situation here weighs much more heavily against the police conduct than it did in *Norris*: here Berke, Rossow, and Veruchi had no probable cause to support their pursuit of defendant; the expressed intention of their entry was, if anything, more specific and limited than that of the officer in *Norris*; and Quanda did not even have the chance to acquiesce to their entry into the basement, because they took to the stairs as soon as she had asked them to come in.

¶ 46    In sum, we hold that the warrantless entry of Berke, Rossow, and Veruchi into the basement of the home where defendant was staying violated his fourth amendment rights. Therefore, the trial court erred in denying defendant's motion to suppress. Because the State could not have proved defendant guilty without the evidence obtained through the illegal entry, we reverse outright his conviction and sentence. See *People v. Cordero*, 358 Ill. App. 3d 121, 127 (2005).

¶ 47    For the foregoing reasons, the judgment of the circuit court of Winnebago County is reversed.

¶ 48    Reversed.